Brianne C. McClafferty
Kathryn Brautigam
HOLLAND & HART LLP
401 North 31st Street, Suite 1500
P.O. Box 639
Billings, MT 59103-0639
Telephone: 406.252.2166
Fax: 406.252.1669
bcmcclafferty@hollandhart.com
kmbrautigam@hollandhart.com

Sherry D. Coley *(pro hac vice pending)*
Tiffany E. Woelfel *(pro hac vice pending)*
Amundsen Davis LLC
2800 East Enterprise Avenue
Appleton, WI  8913
Telephone:  920.431.2239
Fax:  920.431.2279
scoley@amundsendavislaw.com
twoelfel@amundsendavislaw.com

ATTORNEYS FOR PLAINTIFF CONNECTED CONTROLS, INC.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | | |
|---|---|---|
| CONNECTED CONTROLS, INC. | ) | No. 23-CV-84-BU-BMM |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CONNECTED CONTROLS,** |
| vs. | ) | **INC.'S COMPLAINT AND** |
| | ) | **DEMAND FOR JURY TRIAL** |
| DPS ELECTRONICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Plaintiff, Connected Controls, Inc. ("Connected Controls") for its Complaint against Defendant, DPS Electronics, Inc. ("DPS Electronics"), alleges as follows:

## THE PARTIES

1.    Plaintiff, Connected Controls, is a Wisconsin corporation, whose principal place of business is located at 985 Hickory Creek Drive, Oconomowoc, WI 53066.

2.    Connected Controls is a leading manufacturer in digital air-brake testing systems for the railway industry. Its testing systems are sold throughout the United States.

3.    Upon information and belief, Defendant, DPS Electronics, is a Montana corporation whose principal place of business is located at 317 Gallatin Park Drive, Unit 2, Bozeman, MT 59715.

4.    Upon information and belief, DPS Electronics also manufactures and distributes digital air-brake testing systems for the railway industry, as a competitor to Connected Controls.

## JURISDICTION AND VENUE

5.    This is an action arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.    Upon information and belief, this Court has personal jurisdiction over Defendant because:

    a.    DPS Electronics is a Montana corporation with its principal place of business located in Bozeman, Montana;

    b.    DPS Electronics is a person found within the State of Montana pursuant to M.R. Civ. P. 4(a)(3) and 4(b)(1); and

    c.    DPS Electronics has substantial, systematic and continuous contacts with and regularly conducts business within the state by transacting business within Montana and this District.

7.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1400(b) because, upon information and belief, DPS Electronics resides in the District as it is a Montana corporation.

8.    Additionally, venue is proper in this District and the Butte Division because, upon information and belief, DPS Electronics has a regular and established place of business in Bozeman, Montana. Upon further information and belief, DPS Electronics has committed acts of infringement in Bozeman, Montana, as DPS Electronics assembles its products in Bozeman, Montana.

**THE PATENTS**

9.    On October 27, 2020, U.S. Patent No. 10,814,857 ("the '857 Patent"), titled "Wireless Air Brake Testing and Inspection" was legally issued by the United

3

States Patent and Trademark Office ("USPTO") naming Klaus Buchberger and Steven Novak as inventors. A copy of the '857 Patent is attached hereto as Exhibit A.

10.    Connected Controls is the assignee of the '857 Patent and is the owner of all rights, title, and interest, including the right to sue for damages for past infringement and seek an injunction barring future infringement.

11.    On October 25, 2022, U.S. Patent No. 11,479,230 ("the '230 Patent"; together with the '857 Patent, the "Asserted Patents"), titled "Wireless Air Brake Testing and Inspection" was legally issued by the USPTO naming Klaus Buchberger and Steven Novak as inventors. A copy of the '230 Patent is attached hereto as Exhibit B.

12.    Connected Controls is the assignee of the '230 Patent and is the owner of all rights, title, and interest, including the right to sue for damages for past infringement and seek an injunction barring future infringement.

## FACTUAL ALLEGATIONS

13.    Connected Controls was incorporated in May 2016, by Mr. Buchberger.

14.    Air brakes are common in several industries, including the railway industry, which relies heavily on the use of air brakes.

15.     Typically, an "air brake" refers to a type of friction brake, usually for vehicles, that relies on compressed air pressing on a piston to release pressure to a brake pad.

16.     Rail cars often use air brakes.

17.     When rail cars are joined together, the air brakes are also electronically joined. This allows the air brakes to be operated as a single system, in turn, allowing the train to safely brake when necessary.

18.     Many rail cars use a triple-valve system of air brakes. When such a system is used, the railcar brakes remain immovable when there is no air pressure applied and the train will remain at rest.

19.     To release the brakes, thus allowing the rail car, and train, to move, the triple-valve system must be pressurized. Once the system has reached the operating pressure, the brakes are freed, allowing the rail car and train to move.

20.     Once the train is moving, the brakes may be applied to slow or stop the train. This occurs by decreasing the air pressure applied to the system, which moves the brakes into an "applied" position.

21.     When the system is fully depressurized, the brakes are fully applied and the rail car, and thus the train, will no longer be able to move until the system is repressurized again.

22.     Due to the importance of the air brake system, it is critical that it operate properly.

23.     Air brake testing is mandated by the Federal Railroad Administration ("FRA"), and rail companies are subject to inspections by the FRA to ensure testing is routinely performed. Air brake tests must be carried out on a regular basis and the results must be transferred to a report, which is then carried within the train to certify a successful test.

24.     For years, testing was conducted manually. An individual would manually control and change the air pressure in the brake pipes and use a manual device to assess the air pressure within the brake system. As part of the process, the individual was able to determine whether and which brakes were leaking. The individual then had to determine whether that leakage was within allowable limits.

25.     Then, the testing reports were generally filled out by hand either during, or immediately after, the completion of an air brake test, which often lead to accidental or purposeful misreporting of results and/or illegible results.

26.     The claimed invention in the '857 Patent, as invented by Mr. Buchberger and Mr. Novak, shortened the time to create air brake test reports and decreased errors and mistakes in the reports.

27.     The '857 Patent claims a non-transitory computer readable medium[1] which includes instructions executable by a processor[2] to receive information regarding an air brake test, determine whether the test had passed, compare the test results to previous results, determine whether the test results have changed, compile the test results, and generate a completed inspection form based on this information.

28.     Specifically, Independent Claim 1 of the '857 Patent recites:

> A non-transitory computer readable medium including instructions executable by a processor to:
>
> receive information corresponding to an air brake test of a train from a remote handheld device;
>
> determine a status of the air brake test;
>
> transmit the received information to a database, wherein the database includes prior received information for the train;
>
> compare the received information to the prior received information for the train, wherein comparing the received information to the prior received information further comprises:

---

[1] As the '857 Patent explains, a non-transitory computer readable medium could include, but is not limited to, "any electric, magnetic, optical, or other physic[al] storage device that stores executable instructions," such as "RAM, an Electronically-Erasable Programmable Read-Only Memory (EE-PROM), a storage drive, an optical disc, and the like." Exhibit A at col. 3, l. 60-66.

[2] A "[p]rocessor may be one or more central processing units (CPUs), microprocessors, and/or other hardware devices suitable for retrieving and executing instructions stored on a storage medium" or, alternatively, a "processor may include one or more electronic circuits containing a number of electronic components for performing functionality of the stored instructions." Id. at col. 3, l. 48-55.

determining a change in a result of the air brake test; and

tracking an amount of leakage over time for the train;

compile the received information into an air brake test summary, wherein the air brake test summary includes the comparison of the received information to the prior received information; and

generate an inspection form based on the received and compiled information.

<u>Exhibit A</u> at col. 8, l. 12-31.

29.    The '857 Patent has three dependent claims 2–4.

30.    Claim 2  of the '857 Patent recites:

The non-transitory computer readable medium of claim 1, further comprising instructions executable to:

transmit the generated inspection form to a printing device; and

transmit the generated inspection form to a remote computing device.

<u>Exhibit A</u> at col. 8, l. 32-37.

31.    Claim 3 of the '857 Patent recites:

The non-transitory computer readable medium of claim 1, wherein the instructions to transmit the received information to a database include instructions executable to:

store the received information;

receive a confirmation that the air brake test is complete; and

> transmit the received information upon receipt of the
> confirmation of completion of the air brake test.

Exhibit A at col. 8, l. 38-45.[3]

32.    Claim 4  of the '857 Patent recites:

> The non-transitory computer readable medium of claim
> 1, wherein the instructions to transmit the received
> information to a database include instructions executable
> to continuously transmit the received information
> throughout a duration of the air brake test.

Exhibit A at col. 8, l. 46-50.

33.    The '230 Patent is a continuation of U.S. Patent Application Ser. No.

16/296,963, which became the '857 Patent.[4] Where the '230 Patent claims the

software the airbrake testing system uses, the '857 Patent claims the system itself,

including hardware and its necessary software.

34.    Independent Claim 1 of the '230 Patent specifically recites:

> A system, comprising:
>
> a plurality of handheld devices including a plurality of
> transceivers;

---

[3] At this time, Connected Controls is not asserting Claim 3 against the DPS Electronics' accused product. However, Connected Controls reserves the right to assert Claim 3 is infringed as discovery is conducted.

[4] The '857 Patent is a continuation-in-part of U.S. Patent Application Ser. No. 15/700,656, filed on September 11, 2017, which claims priority from Provisional Application No. 62/393,482, filed on September 12, 2016. Exhibit A at col. 1, l. 6-9; Exhibit B at col. 1, l. 8-11.

a control unit coupled to a handheld device of the plurality of handheld devices;

a plurality of end-of-train air devices, wherein:

the plurality of end-of-train air devices are coupled to a plurality of air brakes; and

each end-of-train air device comprises an integrated chip set to send a pressure metric reading to the control unit;

an air manifold coupled to the plurality of air brakes;

a controller coupled to the control unit and to the air manifold, wherein the controller selectively supplies air to an air brake of the plurality of air brakes;

a processor coupled to the controller and the control unit; and

a non-transitory computer readable medium coupled to the processor and containing instructions executable by the processor to:

receive information from the control unit corresponding to an air brake test performed on the plurality of the end-of-train air devices;

determine a status of the air brake test;

compare the received information to prior received information for a train, wherein comparing the received information to the prior received information further comprises:

determining a change in the status of the air brake test; and

tracking an amount of leakage over time for the train;

compile the received information into an air brake test summary, wherein the air brake test summary includes the comparison of the received information to the prior received information; and

generate an inspection form based on the received information and the determined status, wherein the generated inspection form include the air brake test summary.

<u>Exhibit B</u> at col. 7, l. 65-67, col. 8, l. 1-36.

35.    The '230 Patent includes six dependent claims, Claims 2–7.[5]

36.    Dependent Claim 2  of the '230 Patent recites:

The system of claim 1, wherein the control unit is wirelessly coupled to the handheld device.

<u>Exhibit B</u> at col. 8, l. 37-38.

37.    Dependent claim 3 of the '230 Patent recites:

The system of claim 1, wherein the instructions to receive information from the control unit further comprise instructions executable to:

obtain information corresponding to an air brake test at the control unit;

store the obtained information at the control unit for a duration of the air brake test;

transmit the obtained information from the control unit to the non-transitory computer readable medium; and

---

[5] Connected Controls does not currently accuse DPS Electronics of infringing Dependent Claim 3 or 7 of the '230 Patent; however, Connected Controls reserves the right to amend its infringement analysis based upon discovery.

compile the received information.

Exhibit B at col. 8, l. 39-48.

38.    Dependent Claim 4 of the '230 Patent recites:

The system of claim 3, wherein the obtained information is received from the control unit concurrent with the air brake test.

Exhibit B at col. 8, l. 49-51.

39.    Dependent Claim 5 of the '230 Patent recites:

The system of claim 1, wherein the instructions to determine a status of the air brake test further comprise instructions executable to:

determine an amount of air leakage from the received data;

determine that the amount of air leakage is above a threshold amount of leakage; and

determine that the air brake test is a failed test.

Exhibit B at col. 8, l. 52-59.

40.    Dependent Claim 6 of the '230 Patent recites:

The system of claim 1, wherein the instructions to determine a status of the air brake test further comprise instructions executable to:

determine an amount of air leakage from the received dates;

determine that the amount of air leakage is below a threshold amount of leakage; and

determine that the air brake test is a passed test.

Exhibit B at col. 8, l. 60-67.

41.     Dependent Claim 7 of the '230 Patent recites:

>   The system of claim 1, wherein the instructions to
>   generate an inspection form based on the received
>   information and the determined status further comprise
>   instructions executable to:
>
>   retrieve an inspection form;
>
>   populate the inspection form with the determined status
>   and the received information; and
>
>   transmit the generated inspection form to a third party
>   computing device.

Exhibit B at col. 9, l. 1-9.

42.     Connected Controls sells products that embody the limitations of the

claims of the Asserted Patents.

43.     Upon information and belief, DPS Electronics is a Montana corporation

that designs and manufactures electronics for the railway industry and is based in

Bozeman, Montana.

44.     Upon information and belief, DPS Electronics has sold and installed

equipment and an air brake testing system that infringe at least one claim of each of

the Asserted Patents (each a "DPS Electronics System").

45.     Upon information and belief, DPS Electronics sells a number of

products that when combined and installed together, or combined with computing

devices of a customer, create an infringing system. DPS Electronics products that

can be used to create an infringing system include, but are not limited to, the following: the DPS 9000-IB YAC (sometimes called the DPS 9000 YAC-IB), the DPS 9000 YAC, DPS 9000-TIB (Mobile) YAC, the DPS 9000-M (Multi) YAC, and the DPS 2020-He-LD ETD (collectively, the "Accused Systems").[6]

46.    DPS Electronics produces, and provides to customers and potential customers, product descriptions and instructions that explain in detail how to use DPS Electronics' products to create and use systems that infringe at least one claim of each of the Asserted Patents.

47.    Upon information and belief, each of the DPS Electronics Yard Air Control products ("DPS Electronics YAC Products"), including the DPS 9000-IB YAC (sometimes called the DPS 9000 YAC-IB), the DPS 9000 YAC, DPS 9000-TIB (Mobile) YAC, the DPS 9000-M (Multi) YAC, each constitute a material part of the inventions claimed in the  Asserted Patents, and DPS Electronics markets the DPS Electronics YAC Products knowing the same to be especially made or adapted

---

[6] Connected Controls makes this preliminary and exemplary identification of infringing products and infringed claims without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its contentions based on additional information obtained through discovery or otherwise, pursuant to the Federal Rules of Civil Procedure, this Court's Local Rules and any applicable Patent Local Rules, and/or as is otherwise appropriate.

for use in infringement of the Asserted Patents, and not as a staple article or commodity of commerce suitable for substantial non-infringing use.

48.    Upon information and belief, DPS Electronics is actively and knowingly aiding and abetting others (including DPS Electronics' authorized distributors and repair service providers, and customers) to infringe the Asserted Patents with the specific intent to encourage their infringement, through activities such as marketing DPS Electronics' YAC products, creating and distributing promotional and product literature for DPS Electronics' YAC products, and offering technical support and services for infringing systems using DPS Electronics' YAC products that are designed to instruct, encourage, enable, and facilitate the use of the digital cameras in a manner that infringes at least one claim of each of the Asserted Patents.

49.    DPS Electronics has had knowledge and notice of the Asserted Patents, as well of its own infringement thereof, since at least February 3, 2023, by written notice via a cease and desist letter given by Connected Controls' counsel to DPS Electronics, and no later than the date upon which it received the first complaint filed in this suit.

50.    Upon information and belief, DPS Electronics manufactures its products in Montana, including the products that are components of infringing systems.

51.     Upon information and belief, DPS Electronics has sold and installed, or sold and is scheduled to install, infringing products and/or infringing systems in railway yards in Indiana, Georgia, and Calgary and Toronto, Canada.

**FIRST CAUSE OF ACTION**
**INFRINGEMENT OF U.S. PATENT NO. 10,814,857**

52.     Connected Controls repeats and realleges the allegations of Paragraphs 1 through 51 above as if fully set forth herein.

53.     Upon information and belief, DPS Electronics has sold and/or installed at least one DPS Electronics System that includes at least a DPS Electronics YAC product, such as the DPS 9000 YAC, DPS 9000-TIB (Mobile) YAC, the DPS 9000-M (Multi) YAC, or the DPS 9000 YAC-IB in a manner that infringes at least one claim of the '857 Patent.

54.     Upon information and belief, DPS Electronics Systems include a central computer or PLC to conduct air brake tests and to communicate with end-of-train devices to collect and send data related to the air brake test.

55.     The DPS Electronics YAC products may connect to and the data may be accessed through an electronic device, including handheld electronic devices.

56.     DPS Electronics promotes the DPS Electronics YAC products by stating, among other things, that electronic devices used with the DPS Electronics

System may be used to begin an air brake test, to monitor the status of the testing, and to view the results of the testing.

57.    The DPS Electronics YAC products use an electronic device, such as a tablet, computer, or smartphone, to remotely control the parameters of the air test being conducted.

58.    At least the DPS 9000 YAC, DPS 9000-TIB (Mobile) YAC, and DPS 9000-M (Multi) YAC contain a digital air flow meter and, upon information and belief, displays real time test results.

59.    At least the DPS 9000 YAC, DPS 9000-TIB (Mobile) YAC, and DPS 9000-M (Multi) YAC use the end-of-train device for monitoring.

60.    DPS Electronics Systems may use a cloud-based server to hold its communications.

61.    The server in DPS Electronics Systems receives live-streamed air pressure data directly from the controller.

62.    DPS Electronics promotes the DPS Electronics YAC products  by stating, among other things, that they can use "[h]istorical data [to] easily analyze" various measurements and components of the testing, this allows the user to see and store changes in results of the various measurements and compare them to any

historical changes. This includes measurements such as time of each test, train identification, starting and ending pressures, and leakage in PSI, over time.[7]

63.    The DPS Electronics YAC products communicate with the back office to electronically record the test results, so that they may be printed.

64.    Upon information and belief, an inspection form is then generated based on the data collected by the DPS Electronics System.

65.    The DPS Electronics System is capable of exporting the data to computer programs, like Microsoft Excel®, for advanced analysis.

66.    Based upon the information that DPS Electronics advertises about the DPS 9000 YAC, DPS 9000-TIB (Mobile) YAC, DPS 9000-M (Multi) YAC, and DPS 9000 YAC-IB, as well as remarks made by DPS' counsel regarding how the equipment works, DPS Electronics Systems practice every claim limitation of at least Independent Claim 1 of the '857 Patent, including receiving information from a handheld device corresponding to an air brake test; determining the status of the air brake test; transmitting information about the test to a database; comparing that information to prior information about the train; determining any changes in the air brake test results; tracking air leakage; compiling the information for a summary of

---

[7] PSI stands for pound-force per square inch.

the test; and generating the inspection form based on the information both received and compiled.

67.    Upon information and belief, DPS Electronics has made, sold, and/or installed DPS Electronics Systems in rail yards in at least Indiana and Georgia.

68.    DPS Electronics has directly infringed and continues to directly infringe various claims of the '857 Patent, literally, and/or under the doctrine of equivalents, including at least Independent Claim 1, and Dependent Claims 2 and/or 4, under 35 U.S.C. § 271(a), at least by making, offering to sell, and/or selling the DPS Electronics Systems in the United States.

69.    DPS Electronics has indirectly infringed and continues to indirectly infringe various claims of the '857 Patent, literally, and/or under the doctrine of equivalents, including at least Independent Claim 1 and Dependent Claims 2 and/or 4, under 35 U.S.C. § 271(b), by actively inducing customers into installing and/or using the DPS Electronics Systems in the United States.

70.    DPS Electronics has contributorily infringed and continues to contributorily infringe various claims of the '857 Patent, literally, and/or under the doctrine of equivalents, including at least Independent Claim 1 and Dependent Claims 2 and/or 4, under 35 U.S.C. § 271(c), by offering to sell and selling within the United States DPS Electronics YAC products, which are components of a patented apparatus, and that constitute a material part of the invention as recited in

the claims of the '857 Patent, knowing the same to be especially made or especially adapted for use in an infringement of the '857 Patent, and not as a staple article or commodity of commerce suitable for substantial non-infringing use.

71.    DPS Electronics has directly infringed and continues to directly infringe various claims of the '857 Patent, literally, and/or under the doctrine of equivalents, including at least Independent Claim 1 and Dependent Claims 2 and/or 4, under 35 U.S.C. § 271(f)(1), by supplying or causing to be supplied in or from the United States, including but not limited to Montana, all or a substantial portion of the components of the patented system in a manner such that would actively induce the combination of such components outside of the United States, including but not limited to Canada, in a manner that would infringe the '857 Patent if such combination occurred in the United States.

72.    The '857 Patent is valid and enforceable.

73.    DPS Electronics does not have a license or permission to use the '857 Patent.

74.    As a result of DPS Electronics' infringement of the '857 Patent, Connected Controls has suffered and will continue to suffer damages, in an amount not yet to be determined, of at least a reasonable royalty or lost profits, together with interest and costs, in accordance with 35 U.S.C. § 284.

75.    DPS Electronics' infringement of the '857 Patent has been and continues to be willful.

76.    DPS Electronics' willful infringement of the '857 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## SECOND CAUSE OF ACTION
## INFRINGEMENT OF U.S. PATENT NO. 11,479,230

77.    Connected Controls repeats and realleges the allegations of Paragraphs 1 through 77 above as if fully set forth herein.

78.    Upon information and belief, DPS Electronics has sold and/or installed at least one DPS Electronics System that includes at least a DPS Electronics YAC product, such as the DPS 9000 YAC, the DPS 9000-TIB (Mobile) YAC, the DPS 9000-M (Multi) YAC, or the DPS 9000 YAC-IB, and optionally also a DPS 2020-He-LD, in a manner that infringes at least one claim of the '230 Patent.

79.    Upon information and belief, DPS Electronics Systems include a central computer or PLC to conduct air brake tests and to communicate with end-of-train devices to collect and send data related to the air brake test.

80.    The DPS Electronics YAC products may connect to, and the data may be accessed through, an electronic device, including handheld electronic devices.

81.    DPS Electronics promotes the DPS Electronics YAC products by stating, among other things, that electronic devices used with the DPS Electronics

System may be used to begin an air brake test, to monitor the status of the testing, and to view the results of the testing.

82.    The DPS Electronics YAC products use an electronic device, such as a tablet, computer, or smartphone, to remotely control the parameters of the air test being conducted.

83.    At least the DPS 9000 YAC and DPS 9000-M (Multi) YAC contain a digital air flow meter and, upon information and belief, display real time test results.

84.    At least the DPS 9000 YAC and the DPS 9000-M (Multi) YAC use the end-of-train device for monitoring.

85.    The DPS 2020-He-LD is an end of train device.

86.    The DPS 2020-He-LD "features all the same hardware and electronics as the DPS 2020-He which has been proven in the industry since 2011."

87.    Most end-of-train devices contained an integrated chip set to send metric readings to the control unit.

88.    The DPS 2020-He-LD contains 2 gigabytes of logging capability, which can be easily converted for data analysis.

89.    The end-of-train device would be coupled with an air brake in the DPS Electronics System.

90.    The air brakes used with the DPS Electronics System are typically coupled with an air manifold.

91.    The DPS Electronics System uses a cloud-based server to hold its communications.

92.    The DPS Electronics System also contains a processor coupled to the controller and the control system.

93.    The DPS Electronics System receives inputs from both sides—the smart phone and the controller. The DPS Electronics System receives instructions from the smart phone. The DPS Electronics System also receives live-streamed air pressure data from the controller, as well as live-streamed air flow data from the flow sensor.

94.    The server of the DPS Electronics System receives air pressure data directly from the controller, which receives the data from the end-of-train device.

95.    The user can control which air brake is being tested by controlling which air brake track is to be tested using the DPS Electronics System. The DPS 9000 YAC allows the user to "remotely control all parameters of the brake test." The DPS 9000 YAC-IB allows the user to control similarly, including the parameters for the brake application.

96.     DPS Electronics promotes the DPS Electronics YAC products by stating, among other things, that they can use "[h]istorical data [to] easily analyze" various measurements and components of the testing, this allows the user to see and store changes in results of the various measurements and compare them to any

historical changes. This includes measurements such as time of each test, train identification, starting and ending pressures, and leakage in PSI, over time.

97.    The DPS Electronics YAC products communicate with the back office to electronically record the test results, so that they may be printed.

98.    Upon information and belief, an inspection form is then generated based on the data collected by the DPS Electronics System.

99.    DPS Electronics System is capable of exporting the data to computer programs, like Microsoft Excel®, for advanced analysis.

100.   Upon information and belief, DPS Electronics has made, sold, and/or installed such DPS Electronics Systems in rail yards in at least Indiana and Georgia.

101.   DPS Electronics has directly infringed and continues to directly infringe various claims of the '230 Patent, literally, and/or under the doctrine of equivalents, including at least Independent Claim 1 and Dependent Claims 2, 4, 5, and/or 6, under 35 U.S.C. § 271(a), at least by making, offering to sell, and/or selling the DPS Electronics Systems in the United States.

102.   DPS Electronics has indirectly infringed and continues to indirectly infringe various claims of the '230 Patent, literally, and/or under the doctrine of equivalents, including at least Independent Claim 1 and Dependent Claims 2, 4, 5, and/or 6, under 35 U.S.C. § 271(b), by actively inducing customers into installing and/or using the DPS Electronics Systems in the United States.

103.  DPS Electronics has contributorily infringed and continues to contributorily infringe various claims of the '230 Patent, literally, and/or under the doctrine of equivalents, including at least Independent Claim 1 and Dependent Claims 2, 4, 5, and/or 6, under 35 U.S.C. § 271(c), by offering to sell and selling within the United States DPS Electronics YAC products, which are components of a patented apparatus, and that constitute a material part of the invention as recited in the claims of the '230 Patent, knowing the same to be especially made or especially adapted for use in an infringement of the '230 Patent, and not as a staple article or commodity of commerce suitable for substantial non-infringing use

104.  DPS Electronics has directly infringed and continues to directly infringe various claims of the '230 Patent, literally, and/or under the doctrine of equivalents, including at least Independent Claim 1 and Dependent Claims 2, 4, 5 and/or 6, under 35 U.S.C. § 271(f)(1), by supplying or causing to be supplied in or from the United States, including but not limited to Montana, all or a substantial portion of the components of the patented system in a manner such that would actively induce the combination of such components outside of the United States, including but not limited to Canada, in a manner that would infringe the '230 Patent if such combination occurred in the United States.

105.  The '230 Patent is valid and enforceable.

106.   DPS Electronics does not have a license or permission to use the '230 Patent.

107.   As a result of DPS Electronics' infringement of the '230 Patent, Connected Controls has suffered and will continue to suffer damages, in an amount not yet to be determined, of at least a reasonable royalty or lost profits, together with interest and costs, in accordance with 35 U.S.C. § 284.

108.   DPS Electronics' infringement of the '230 Patent has been and continues to be willful.

109.   DPS Electronics' willful infringement of the '230 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Connected Controls, Inc., prays for relief as follows:

A.     For a judgment in favor of Connected Controls declaring that DPS Electronics infringes, and has infringed, the '857 Patent and the '230 Patent;

B.     For a judgment in favor of Connected Controls declaring that DPS Electronics induces, and has induced, infringement of the '857 Patent and the '230 Patent;

C.     For a judgment in favor of Connected Controls declaring that DPS Electronics contributorily infringes, and has contributorily infringed, the '857 Patent and the '230 Patent;

D.     For a grant of a preliminary and permanent injunction pursuant to 35 U.S.C. § 283, enjoining DPS Electronics, and all its respective officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, from further acts of infringement;

D.     For a judgment awarding Connected Controls compensatory damages as a result of DPS Electronics infringement of the '857 Patent and the '230 Patent, together with interest, including pre- and post-judgment interest and costs, and taxation of all allowable costs against DPS Electronics, and in no event less than a reasonable royalty, and an accounting, in accordance with 35 U.S.C. § 284;

E.     For a judgment declaring that DPS Electronics' infringement of each of the Asserted Patents was willful and that this case is exceptional, and awarding Connected Controls its expenses, costs, and attorneys' fees in accordance with 35 U.S.C. § 285 and Rule 54(d) of the Federal Rules of Civil Procedure; and

F.     Awarding such other and further relief as the Court deems proper.

## JURY DEMAND

Plaintiff, Connected Controls, Inc, hereby demands a jury trial as to the above cause of action.

Dated this 14th day of November, 2023.

/s/ Brianne C. McClafferty
Brianne C. McClafferty
HOLLAND & HART LLP

**ATTORNEYS FOR PLAINTIFF
CONNECTED CONTROLS, INC.**

30616636_v2

28